May it please the Court, Ina Lipkin for the petitioner. This, too, is an immigration matter where the board affirmed the immigration judge's denial based on credibility grounds. It seemed that the board focused on minor mistakes that the petitioner made regarding the dates of his arrest in 1992 and the manner of treatment he received, as well as who released him from his last arrest. I'll address those in turn. You know, let me ask you this. If it were, for example, a statement, geez, I don't know whether I was arrested on February 12th or February 22nd, I mean, sure, who could remember that? That would be minor. But the problem is that he first said that he was arrested three times in February of 1992. Then he said three times in the year 1992. Then he said twice in 1992. And once in 1993. And he couldn't remember at all when he was arrested in 1996. Now, that starts to get way away from minor and much more into the kind of territory where you can say, you know what, he just doesn't, he's just making this up. Well, Your Honor, this petitioner testified to six arrests. And the three that he ultimately stated occurred in 1992 and 1993 occurred 10 to 11 years prior to the merits hearing. These arrests were very short in duration. One was two to three hours long. And I submit that it is reasonable for a person on the stand with his life on the line describing the events that occurred to have some confusion about events that perhaps did not leave as severe an impact in his memory as the ones later. I mean, the thing is, if they do have the kind of impact that he's trying to convince the I.J. that they had, sure, as I said, you can't remember necessarily the date, but you could at least get a ballpark, or else not make up three different stories. That's the whole problem. He could say, look, I don't have any idea at all. I know it was sometime four or five years ago. That would be more credible. I'm just postulating to you that would be far more credible than to say, well, there were three arrests in February of 1992. That's very specific. And then change it and say, no, no, no, no, that's not right. There were three arrests during that year. And then say, no, no, no, no, that isn't right.  And I can't even, you know. Your Honor, what you've described, in fact, shows that he's not enhancing his claim. If you look at the first page of his declaration, he says in a very general way, I was arrested in connection to some participation with rallies in 1992. He doesn't state months, and he doesn't give much detail. And when he's questioned on direct examination, again, he doesn't have that much detail about those arrests, because they were not the arrests in which he suffered the most horrendous forms of torture and the worst allegations of anti-national activity. So I think it's very reasonable when discussing events that did occur in the most far-out past that did not have as many components of persecution as the most recent events, that he would make these minor mistakes. It's not as if he was saying 89, 92. I mean, he was in the ballpark. It was in 92. The arrests only lasted a few hours. And they were not as important to him or as terrible to him as the arrests that occurred in 96 and 2001, in which he was very consistent and credible. Now, I really couldn't find any sort of inconsistency with those. So even if the court ---- There was an inconsistency with respect to what happened after that arrest. I mean, he said on the one hand that his in-laws came to get him, and on the other hand that they didn't. Well, Your Honor, if you look at the declaration and compare it with his testimony, in the declaration he states that his father didn't physically go get him, but he's the one who made the arrangements, paid for the bribe. And when you look at the testimony, he too clearly states, my in-law, my father-in-law is the one who took me. So I think the inconsistency is minor. And if there is an inconsistency, I think it's maybe due to a misunderstanding on his part of the way the question was framed, and it wasn't, again, to enhance his claim. And I don't think it showed a desire to malign before the court. He was, in the end, consistent. It was my father-in-law who physically took me. Some of the other things that were mentioned, again, I don't think go to the heart of the claim. It looked cumulatively. And the IG's reliance on her speculation regarding the veracity of the documents, I think, negatively influenced her credibility findings. And the board had looked at her decision regarding the driver's license in particular and found, you know, you have not sent this for forensics. I'm sure they were looking at Coomer v. Gonzalez. This is clearly based on your speculation, so we can't find that, that we can uphold your frivolous finding. But then if you look under the layers of reasoning from the IJ, from the very beginning, the first page or two of her decision, she states that I'm going to rest, in a nutshell, my credibility finding because of these documents. And what was her reliance on the documents? It was based on speculation. I don't understand exactly what the problems were about the so-called driver's license. Can you explain that clearly? You know what? I've never physically looked at the driver's license. A different attorney was there before the court. But I think she had alleged that. Stand back from the microphone. Is that what's going on here? It's just easier to hear. Too ugly. I think she thought that there was a fake background to the, you know, if there's a face and then there's the background. And she thought there was some problem with it. I never saw the original, so I can't comment on it. But in these instances, she had the right and the government did as well to send that for forensics and they would have gotten a result either way. It would have told them in no uncertain terms. But to speculate, she's not an expert. She's not a document expert, especially with local documents. We don't know if this was locally made or, you know. The confusion is possibly about the background against which his picture was taken. Is that? I just couldn't figure out what was going on there. I think she inferred that it was a cutout of the person's face against the background. But, I mean, I can't tell looking at the photocopy of the record. And, again, nothing was sent out. I mean, for this reason alone, I think remand is necessary. I'm going to save my time for rebuttal. Certainly. Mr. Wang. For openness, Mr. Wang, did you ever see this license? I have, Your Honor. Apparently, the I.J. thought that the pictures were the same, that it was a personal picture and a picture of his driver's license, and, therefore, the driver's license was fraudulent because he used the same picture, which presumably was a personal picture. Rather than one that the government would have taken on the to make the driver's license. That's correct, Your Honor. And the Board did not specifically rely upon the driver's license in making its adverse credibility finding. In fact, it did conduct a very thorough and independent review of the immigration judge's findings and decided that this driver's license was not sufficient to rest an adverse credibility finding upon. Well, I was wondering what really was the BIA saying to us when it says, the immigration judge made a credibility finding adverse to the respondent. Even if insufficient to support a sweeping adverse credibility finding under applicable circuit law, testimony and documents submitted by the respondent provided the immigration judge with legitimate reason to question the veracity of the respondent's claim. Now, are they supporting the adverse credibility finding, or are they saying it's really not good enough? I really, it's an odd statement. Your Honor, that statement puzzled me as well. As far as I can tell, there's nothing in circuit precedent regarding what constitutes a sweeping adverse credibility finding. My interpretation of that statement is that not everything that the immigration judge set forth as supporting the adverse credibility finding necessarily supported the finding in the Board's view. I think the immigration judge threw out basically all of Mr. Singh's supporting documents when it determined that his driver's license was fraudulent, basically said, okay, his driver's license is fraudulent, therefore, none of these documents are any good. I believe the immigration judge also pointed to the fact that Mr. Singh did not know about Operation Blue Star. The Board did not rely upon that lack of knowledge in Mr. Singh. What the Board did was did take an independent review of the immigration judge's finding and sort of distilled what the immigration judge found and picked out the most significant discrepancies within Mr. Singh's testimony and between his documentary evidence and testimony and determined that was sufficient to support an adverse credibility finding. And the government believes that is more than sufficient to allow a reasonable fact-finding to determine that Mr. Singh was not credible. Of particular import, we think the most important omission is Mr. Singh's failure to mention on direct testimony regarding his 1996 arrest that he was subjected to a roller rolled over his legs. Mr. Singh had every opportunity in direct testimony on transcript pages 16 to 17 when his attorney asked him, you know, what kind of abuse did you suffer in the 1996 arrest? He didn't mention that, having to stand out in the hot sun and having a roller rolled over his leg. It was only upon cross-examination that when the government attorney asked him, oh, look, your declaration says you had to stand out in the hot sun and you had a roller rolled over your leg. Why didn't you mention that? And Mr. Singh said, oh, I get very emotional and sometimes I forget these details. And that could be a possible, plausible explanation when you're in a situation where your life is almost dependent upon what you're being asked to talk about. I think that's certainly a plausible interpretation of Mr. Singh's testimony. The problem for Mr. Singh is that as a court of review, you're in the position of determining whether this particular evidence compels reversal of the IJN board's finding that this piece of evidence does not support an adverse credibility finding. We think that this piece of evidence, it goes to a seminal event in his 1996 arrest. It wasn't a mere missing detail. I think if you look at the rest of his testimony regarding his 1996 arrest, he testified that he was beaten with a baton. And in his declaration, he said he was stripped naked and beaten with sticks. And I think the fact that he omitted his, he omitted the fact that he was stripped naked in his testimony, that would be what I would consider to be a minor detail that he omitted, not the fact that he had to stand all day in the hot sun and had a roller rolled over his legs. That seemed to be a very significant event that he just completely failed to mention on direct testimony when he had the opportunity to do so. You know, when they embellish things on direct testimony, I think I'm always concerned, but when they fail to talk about something which helps their case very considerably, you're less thinking that they're dissembling or not, you know, telling the truth. I see a distinction there. I understand, Your Honor, that many of the immigration cases you've had that I've seen involve discrepancies between a declaration and an oral testimony, which the oral testimony is more detailed than the declaration rather than the other way around. They really make the story better. That's not what was going on here. And he says I'm emotional and I, which seems like a... Well, Your Honor, there is one aspect. After his 2000 arrest, he stated that he received medical treatment following his 2000 arrest. He didn't mention the medical treatment in his declaration, and that is an example of where there's another discrepancy between his declaration and his testimony in which there was no omission in the declaration this time, and then he embellished it on direct testimony. So you've got two sets of significant discrepancies, one in which the declaration was more detailed and one in which the oral testimony was more detailed. Adding to these discrepancies are the points regarding dates that Judge Reimer brought up in Petitioner's opening argument. I think a great example of the significance of this date discrepancy is an argument that the government pressed at the merits hearing. Regarding his 2001 arrest, Mr. Singh testified that he was detained. He was detained beginning on January the 22nd and detained for 11 days, which would bring his release date to February the 2nd, and he had a doctor's note saying that he received treatment on February the 1st. That's the kind of thing, I mean, I don't know who I was talking to about it before. I mean, that's the kind of thing, how would you possibly be held to remember one date, one day as contrasted with the next day in member terms? That doesn't strike me as being a big deal. That's right, Your Honor, and that's why the immigration judge and board did not rely upon that particular discrepancy. And I think that just highlights the fact that if you're off by a day or a few days, say February 1st to February 2nd, you know, February 1st to February 12th, that's not a significant omission. I mean, counting days, if you're alleged that you were detained for 11 days, you may not know. If you were detained for 10 or 11, you might not remember. But the fact that you can't remember whether you were arrested three times in February 1992, three times in 1992, or two times in 1992, certainly does call into question your credibility. I mean, that seems to be a very significant discrepancy in dates. I'd also like to point out that with regard to the 1996 arrest, he initially testified that he was arrested in January of 1996, and then he testified several minutes later on direct testimony that he couldn't remember the date he was arrested. And subsequently, on cross-examination, couldn't remember the specific month he was arrested. Finally, another point that Judge Dreimer brought up, in his declaration in cross-examination, Singh stated that his father-in-law came to pick him up, came to pick up his wife and kids from the village after his release from the 2001 arrest, while on direct testimony, he stated that they went to his in-laws' place. These discrepancies that I've just mentioned collectively all relate to the event central to Singh's claim for asylum, that his allegedly unlawful arrest and abuse by the police, and they were not trivial, and therefore, they justify the Board's conclusion that he was incredible. And in any event, even assuming that these events were minor, their cumulative effect certainly casts doubt on whether this – whether the persecution ever occurred. You know, I sometimes think that the more absolute perfect story is really more incredible than the one where they really are struggling with memory and struggling with testimony under, you know, stressful circumstances. Your Honor, I would say that's probably a good point. I mean, if someone's story is perfect, that might indicate that that individual was coached by his or her attorney. Yeah, they really got it perfect, and so you don't know where the truth lies. Yeah. The immigration judge and the Board have seen countless number of these cases, and they're in the best position to determine, based upon the accumulation of the evidence and the demeanor of the alien, whether his or her story is correct. And that's why the review of this Court is, you know, basically for substantial evidence, not a de novo review, because basically the immigration judge and the Board have seen a lot of these cases and know exactly – probably have the best idea whether the person is telling the truth or not. That's why I kind of focused in on the BIA are uncomfortable about this case. There's no doubt about it when they say, well, we're not sure that it would support an inquietability finding under the circuit law. And I'm not quite sure what they meant by that, but they certainly were expressing some discomfort. Your Honors, I see my time has expired. If you have any additional questions, I'd be free to answer them now. I don't think so. Thank you. Well, I'd ask the panel to dismiss the petition and affirm the judgment of the Board of Immigration Appeals. Thanks. Thank you. Ms. Lipkin. Your Honors, I find it amazing that the government would grasp at straws to dismiss this case. The government would have you penalize the petitioner, find him incredible because he submitted a supporting document that is the medical examination letter. He wrote in his declaration that after his last arrest he was, quote, unquote, in a bad condition. He doesn't need to write, and the law does not require him to write that I sought medical attention. And then if he submits a medical letter to corroborate it for this court to find, that's inconsistent. That's ridiculous. He mentioned he was in a bad condition, and so it's very plausible that he would then flesh out the details of his case by supplying corroborating documents to the court. And that's what he did in the medical letter, which corroborated all of his explanation of abuse during his last arrest. Once again, any minor mistakes regarding these 92 arrests I strongly feel are relevant. The worst abuse and the one that the incidents that this Court should look at are the last two arrests. Standing alone, they are sufficient to establish past persecution and a well-founded fear of future persecution. That's all. Thank you. Thank you. Counsel, I appreciate your argument, and the matter just argued will be submitted. We'll next hear argument in Vaughan, which is the Bay Environmental Management. Thank you.
judges: B. Fletcher, Rymer, Duffy